IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 92-4558

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PAUL D. BROUSSARD,

Defendant-Appellant.

———————————

Appeal from the United States District Court
for the Western District of Louisiana

———————————

(March 17, 1993)

Before Reynaldo G. GARZA, HIGGINBOTHAM, and DeMOSS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

Paul D. Broussard was convicted by a jury in the Western District of Louisiana of possession with intent to distribute marijuana, contrary to 21 U.S.C. § 841 (a)(1),(b)(1)(D), and knowingly using and carrying firearms during and in relation to a drug trafficking offense contrary to 18 U.S.C. § 924(c)(1).

Armed with a search warrant issued by a state magistrate, officers searched Broussard's mobile home in Lafayette, Louisiana. The search uncovered a small marijuana growing operation and three guns, a Colt Ar-15 assault rifle, a Mossberg sawed-off 20 gauge shotgun with a pistol grip, and a Sig Sauer P220 .45 caliber pistol. After Miranda warnings, Broussard made a number of incriminating admissions to the arresting officers.

At trial, Broussard objected to the court's refusal to peremptorily strike two females. Broussard accepted the first woman on the venire but challenged the second. Without objection from the government, the judge responded that she was a member of a protected class and counsel must state a reason for his challenge. After counsel said she was a teacher and he did not want too many teachers on the jury, the judge demanded a "good reason . . . a reason why you feel in her responses she could not be fair and impartial." The court nevertheless allowed the challenge and excused the juror. Counsel for Broussard accepted the third woman but then objected to the fourth on the grounds that she was a teacher and had a relative who was a policeman. The court denied the challenge. The fifth woman was accepted and counsel for Broussard objected to the sixth based on her demeanor. The court again denied the challenge. The final jury consisted of 9 females and 3 males, the court having denied Broussard's attempt to exercise two peremptory challenges against women.

Broussard argues that his conviction should be reversed for any of four reasons. First, he urges that the district court erred in applying Batson v. Kentucky, 106 S.Ct. 1712 (1986), to his peremptory challenge of two female venirepersons. This argument has two parts: the doctrine does not apply to gender-based discrimination, and if it does, the district court erroneously required that he give sufficient reasons for cause rather than accepting any rational gender-neutral reason. Second, Broussard argues the warrant authorizing the search of his mobile home was

2

not supported by an adequate affidavit.  Third, the court erred in refusing his requested jury instruction regarding the required connection between the drug offense and his gun possession. Fourth, Broussard asserts error in denying a reduction for acceptance of responsibility.

We are persuaded that Batson should not be extended to gender-based discrimination and that in any event the court misapplied the doctrine by insisting on more than gender-neutral explanations for the peremptory challenges.  We reverse the conviction for these two reasons and remand for a new trial.  In doing so, we reject the government's contention that the harmless error doctrine is applicable.  Because we remand and the remaining contentions are likely to remain issues at a second trial, we also examine Broussard's arguments regarding the search, instructional error, and errors in sentencing.  Of course, that the sentencing issue will not arise if Broussard is acquitted is not a suggestion regarding the likelihood of conviction, but is rather, an expression of the probability of encountering the issues should the case play through conviction, a second time.  This is both the product of our unwillingness to address hypothetical questions and responsibility for conserving judicial resources, ours and the district court's.

## I.

### A. Batson and Gender

The Supreme Court attempted to accommodate the command of equal protection and the tradition that peremptory challenges were

3

an important element of fair trials, although without independent constitutional protection, in Swain v. Alabama, 380 U.S. 202, 219 (1965). Swain, a black man, argued a violation of the Equal Protection Clause based on the prosecution's use of peremptory challenges to eliminate all blacks from his venire and the fact that no black had served on a Talledega County petit jury in 15 years. After examining the "very old credentials" of the peremptory challenge and its importance to the fairness of our trial system, the Court concluded that purposeful discrimination was not established from the striking of all minorities from the venire in a given case. The Court explained that "[i]n light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case." Id. at 222. However, purposeful discrimination could be proved by trailing peremptory challenges over cases. With the pattern of strikes across cases, there emerges brightly an otherwise evanescent line between the intuit of trial counsel striking for the best jury for her client and indefensible bigotry.

In Batson, the Court reexamined this balance. After 20 years of experience under Swain, the Court relaxed the burden of proving purposeful racial discrimination by allowing its proof in a given case by requiring counsel to articulate race-neutral reasons for a challenged peremptory of a black venireperson. The court was careful that its rule not "undermine the contribution the challenge

4

generally makes to the administration of justice." 106 S. Ct. at 1724.

Batson does not say, yet, its found impetus was undeniably more than analogical reasoning and more than a felt moral imperative independent of constitutional command. Batson's move from Swain rested on a recognition that race lies at the core of the commands of the Fourteenth Amendment. 106 S. Ct at 1716.[1] This sense that race is different from other classifications has long generated difficulties in the treatment of other groups clamoring for identical protection. For the most part, they have not been successful. More to the point, gender as a classifier failed to achieve the protection of a suspect class with its high level of scrutiny. Rather, the Court has found that gender classes trigger only an intermediate level of scrutiny, a protected class but with lesser protection than race. Mississippi University for Women v. Hogan, 458 U.S. 718, 724 (1982); Craig v. Boren, 429 U.S. 190, 197 (1976).

At one level, our question is the balance between the command of equality and fair trial. See McCullum, 112 S. Ct. at 2357-58

---

[1] The Supreme Court's post-Batson cases have all dealt with the use of peremptory strikes to remove black or racially identified venirepersons, and all have described Batson as fashioning a rule aimed at preventing purposeful discrimination against a cognizable racial group. See Georgia v. McCullum, 112 S. Ct. 2348 (1992) (blacks); Hernandez v. New York, 111 S. Ct 1859 (1991) (Latinos); Edmonson v. Leesville Concrete Co., 111 S. Ct. 2077 (1991) (blacks); Powers v. Ohio, 111 S. Ct. 1364, 1367-68 (1991) (blacks); Ford v. Georgia, 111 S. Ct. 850, 854 (1991) (blacks); Holland v. Illinois, 110 S. Ct. 803, 805 (1990) (blacks); Griffin v. Kentucky, 479 U.S. 314, 316 (1987) (blacks); Allen v. Hardy, 478 U.S. 255, 259 (1986) (blacks and Hispanics).

5

(balancing the interests served by Batson with the criminal defendant's right to a fair trial). Narrowed to the case at hand, our focus is on peremptory challenges in a specific case and not across cases, so our specific issue is whether we ought with gender to step-up from Swain to Batson.

Two circuits have given opposite conclusions. Compare United States v. DeGross, 960 F.2d 1433 (9th Cir. 1992) (en banc) (extending Batson to gender) with United States v. Hamilton, 850 F.2d 1038 (4th Cir. 1988) (declining to do so); see also United States v. Nichols, 937 F.2d 1257, 1262 (7th Cir. 1991) (arguably deciding that Batson does not apply to gender). The state courts are divided two against one for the position that Batson should not be extended to gender. Compare State v. Culver, 444 N.W.2d 662 (Neb. 1989) and State v. Oliviera, 534 A.2d 867 (R.I. 1987) (refusing to apply Batson to gender) with People v. Irizarry, 560 N.Y. S.2d 279 (N.Y. App. Div. 1990) (extending Batson to gender).

The Ninth Circuit in DeGross saw the issue in terms antithetical to the idea that litigant choice enhances the perceived fairness of a petit jury to the public good. In that court's view "full community participation in the administration of the criminal justice system, whether measured by race or gender, is critical to public confidence in the system's fairness." 960 F.2d at 1439. We see this view as begging the essential question of "full" participation, a question answerable only by consideration of the interests in fair trial served by the system of peremptory challenges.

6

The unique history of racial discrimination aside, full community participation in the justice system is not disserved by the centuries old system of strikes. The entire process of jury selection is studiously random--random in the math sense. Full participation can only mean random selection because all cannot serve. Peremptory challenges in the absence of ties across cases is part of that process of randomness.[2] In equal protection terms, the contributions to a perception of fairness in the petit jury of peremptory challenges is an important governmental interest. See Batson, 106 S. Ct. at 1724 (recognizing "that the peremptory challenge occupies an important position in our trial procedures"). That interest would be frustrated by extending Batson to gender because it would require, on demand of counsel, an explanation for every strike. It is true that the explanation would need to be only a non-gender rooted reason. In the real world of trials, facing an explanation for every challenge is a practical frustration of peremptories. See Holland, 110 S. Ct. at 809 (rejecting application of Sixth Amendment fair-cross section principles to petit jury to avoid the effective "elimination of peremptory challenges").[3]

---

[2]Bear in mind that we are rejecting only the procedural requirements of Batson. The ultimate constraints of equal protection remain in place. We are not willing to extend the essentially symbolic process of Batson to the strike of every venireperson.

[3]In DeGross, the Ninth Circuit did not pause in its treatment of gender-based discrimination with the fact that the excluded venirepersons were men. Presumably then under DeGross, counsel must offer gender-neutral reasons for every strike a fortiori for race. So that with every preemptory challenge of

7

It has been said that peremptory challenges cannot lie with equal protection principles. In an important sense this is not so. All venirepersons are subject to the arbitrary dismissal of counsel for both sides. As Swain recognized, the inequality surfaces when the choices are across cases. 380 U.S. 223-24. When race controls peremptory challenges across cases, blacks are no longer equally subject to the randomness of peremptory challenges. Rather, blacks were singled out because of their race. This view of peremptory challenges, as a subset of a larger and random process, as not presenting equal protection issues at all in a discrete case was rejected in Batson, at least for race. This especial condemnation of racial criteria is in part reflective of its high level of protection enjoyed under the two-tiered construct of equal protection, or even under Justice Marshall's preferred sliding scale. Simply put, gender discrimination and racial discrimination are different in relevant ways.

More to the point, apart from race, there is no case for the step-up from Swain to Batson. Women are not a numerical minority and therefore do not face similar barriers to full jury participation. That women are not numerical minorities looms large because the focus of Batson is upon selecting a petit jury from a randomly chosen venire. This means that striking women, or men, for the sole reason of their sex is nigh pointless because it cannot succeed except in isolated cases. This case illustrates the

---

white, black, male and female, non-racial and non-gender based reasons must be offered. The frustration of peremptory challenges, however, would not necessarily stop here.

point. The district judge's intervention to protect this "protected class" of female venirepersons added two females, at best, to the seven females that otherwise would have served. Nine of the twelve jurors who decided this case were women. If the bias is sex alone, its implementation is chilled by the numbers, by the reality that not only will women nonetheless be on the jury, albeit perhaps in lesser number, so also will there be jurors not wanted for other reasons left on the jury because the strikes were spent in a sexist way. Suffering the other unwanted jurors might be a payable price if determined counsel could either eliminate all women or cut their number to one or two. It is a foolish price for the bigot when the result, as in this case, would be a jury that nonetheless had a substantial number of female jurors.

We are persuaded that Swain is a sound accommodation of the interests of fair trial and interests in selection free of gender bias. Experience has not taught us that Swain is inadequate for gender. This is critical because it was experience and functional necessity--not analogical reasoning that decided Batson and in our view ought to decide this case.

With all deference to our sister court, the assertion in DeGross of historical exclusion of women from jury service misses the mark. We will not here rehearse the differences between race and gender reflected in their differing levels of scrutiny under the equal protection clause. We must, however, decry general invocations of historical discrimination against women; they are not fully responsive to the assertion that no case for extending

9

Batson to gender has been made.  For example, the string citation to Taylor v. Louisiana, 419 U.S. 522 (1975), ignores the political reality that the Supreme Court did not strike down the offending provision of the Louisiana code.  It was repealed--hardly an example of political powerlessness.  It is true that women were excluded from jury service under the English common law and were disqualified by state laws until the end of the 19th Century.  It is also the case, however, as Justice White observed in 1974 that ". . . [t]oday, women are qualified as jurors in all the states" id. at 533.  Relatedly, it was the Congress that in 1957 assured that women could not be excluded from federal jury service.  Civil Rights Act of 1957, 71 Stat. 638, 28 U.S.C. § 1861 (1964 ed.).  Batson is a prophylactic device reached for in response to demonstrated need.  Experience has not demonstrated a similar and sufficient need for its use with gender.  The evidence is not there and is virtually certain not to be, so long as the venire is randomly chosen.

### B.

Assuming Batson is applied to gender based peremptory challenges, the district court nevertheless misapplied the doctrine by insisting on more than gender-neutral explanations for the defendant's challenges.  See also Georgia v. McCullum, 112 S. Ct. 2348 (1992) (applying Batson to a criminal defendant's use of peremptory challenges).

Once a prima facie case of discrimination is shown,[4] Batson requires counsel to justify each challenge with a race-neutral explanation. 106 S. Ct. at 1723; Hernandez v. New York, 111 S. Ct. 1859, 1866 (1991). Thus, if Batson were extended to this case, we would insist on a gender-neutral reason. From the trial transcript, it is clear that the district judge placed a more difficult burden on counsel for Broussard. The judge insisted on a good reason for believing the challenged juror could not be impartial. This is the standard required to exercise a challenge for cause. See Batson, 106 S. Ct. at 1723 ("we emphasize that [counsel's] explanation need not rise to the level justifying exercise of a challenge for cause").

C.

The government agrees that Batson should not apply to gender and, assuming we were to extend the doctrine, concedes error in the district court's application. However, the government urges us to affirm under the doctrine of harmless error. We can not accept this invitation. The denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice. Swain v. Alabama, 380 U.S. 202, 219 (1965); Knox v. Collins, 928 F.2d 657, 661 (5th Cir. 1991). Ross v. Oklahoma, 108 S. Ct. 2273 (1988), does not support the application of harmless

---

[4]We express no opinion on whether defendant's peremptory challenges supported a prima facie case. See United States v. Forbes, 816 F.2d 1006, 1010 (5th Cir. 1987) ("appellate review should not become bogged down on the question of whether the defendant made a prima facie showing in cases where the district court has required an explanation").

11

error. In that case, the trial court erroneously refused to excuse a juror for cause and state law required the defendant to exercise a peremptory challenge against that juror to preserve the issue for appeal. The combination of the trial court's error and state law effectively denied the defendant the use of one peremptory challenge. The Court, however, found no violation of the defendant's right to an impartial jury under the Sixth and Fourteenth Amendments, because the juror who should have been dismissed for cause did not sit and there was no showing that the jurors who actually sat were partial. The Court also stated that "the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides." Id. at 2279. In United States v. Prati, 861 F.2d 82, 87 (5th Cir. 1988), we characterized Ross as setting forth the standard for assessing the effect of an increase or decrease in the number of peremptory challenges caused by a trial court's erroneous ruling on a challenge for cause. Here, we are not dealing with the impact of an erroneous ruling on a challenge for cause on peremptories, but an erroneous ruling with regard to peremptory challenges themselves. Applying the doctrine in this context would eviscerate the right to exercise peremptory challenges, because it would be virtually impossible to determine that these rulings, injurious to the perceived fairness of the petit jury, were harmless.

## II.

Broussard argues that the district court should have granted his motion to suppress the evidence found in his mobile home,

because the warrant authorizing the search was not supported by an adequate affidavit. In other words, the warrant affidavit did not detail probable cause.

We recently discussed the minimum requirements for a warrant affidavit in United States v. Satterwhite, 980 F.2d 317, 320-21 (5th Cir. 1992). Under the good faith exception to the exclusionary rule, evidence obtained by law enforcement officials acting in objectively reasonable good-faith reliance upon a search warrant is admissible. United States v. Leon, 468 U.S. 897, 922-23 (1984). However, an official can not claim objective good faith where the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Leon, 468 U.S. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part)); see also United States v. Craig, 861 U.S. 818, 821 (5th Cir. 1988) (referring to this type of affidavit as a "bare bones" affidavit). We have said that "bare bones" affidavits "contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." Satterwhite, 980 F.2d at 320-21. We must examine the "totality of the circumstances." Illinois v. Gates, 103 U.S. 2317, 2333 (1983). This includes all of the facts in the affidavit, including the informant's veracity, reliability, and basis of knowledge. United States v. Jackson, 818 F.2d 345, 348, 350 n.7 (5th Cir. 1987).

13

The affidavit supporting the warrant in this case relies on an unnamed cooperating individual in the first paragraph:

> During the past several days a cooperating individual who is known by affiant to be familiar with marijuana cultivation techniques told the affiant that marijuana was being cultivated in the above described trailer which belongs to Paul D. Broussard, W/M, DOB 11/09/52. Cooperating individual further advised affiant marijuana and cultivation equipment had been seen at the location within the past two months. The CI said that Paul D. Broussard had been cultivating marijuana since 1989 Hydroponically.

In addition to this information from the CI, the affidavit includes other corroborating facts: Broussard's electricity usage doubled in June 1991, and he did not inquire with the electric company. June is the height of the marijuana growing season, and it takes large amounts of electricity to use indoor growing equipment. Broussard did not have a job. All of the windows in Broussard's trailer were blacked out. Broussard seldom left his trailer. Occupants of Broussard's residence purchased Hydroponic gardening equipment in 1989. A "Thermal Imaging" device, although not conclusive, indicated more intense heat being emitted from Broussard's mobile home than others in the area.

As the government acknowledges, this affidavit says very little about the informant's veracity, reliability, and basis of knowledge. It does say that the CI "is known by affiant to be familiar with marijuana cultivation techniques," which goes to the informant's reliability. The basis for the informant's knowledge, however, is not given. The affidavit simply says "marijuana and cultivation equipment had been seen" at Broussard's house. We do

not know whether the CI had first hand knowledge or whether he was relying on a third person.

Significantly, the affidavit does not rely completely on the information from the CI. These other corroborating facts--electricity, blackened windows, thermal imaging,--considered with the information from the CI provide sufficient evidence of probable cause. There is more here than in the "bare bones" affidavits involved in Jackson and United States v. Barrington, 806 F.2d 529 (5th Cir. 1986). In Jackson, the informant was himself involved in the crime and his reliability was not established by corroboration. 818 F.2d at 348. In Barrington, the affidavit simply said the officer "received information from a confidential informant" who is "known to [the officer] and has provided information in the past that has led to arrest and convictions." 806 F.2d at 531. We conclude that Broussard's motion to suppress was properly denied.

III.

In his third assignment of error, Broussard argues that the district court erred in refusing his requested jury instruction for the offense of using or carrying a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1).[5] He does not challenge the sufficiency of the evidence to support this conviction. Of course, that argument may be available on appeal if

_____

[5]Section 924(c)(1) provides:

Whoever, during and in relation to any crime of violence or drug trafficking crime . . ., uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years . . .

15

Broussard is convicted on remand. Here, Broussard argues that the trial court's instruction, which was based on the Fifth Circuit Pattern Jury Instructions § 2.45, impaired his ability to argue his defense to the jury.[6] His defense focused on the "during and in

---

[6]The district court gave the following instruction:

Title 18 of the United States Code Section 924(c)(1) makes it a crime for anyone to use or carry a firearm during and in relation to a drug trafficking crime. For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt: First, that the defendant committed the crime alleged in Count 1. I instruct you that possession of marijuana with intent to distribute is a drug trafficking crime. Second, that if the defendant knowingly used or carried a firearm during and in relation to the defendant's commission of the crime alleged in Count 1. It is not necessary that the government prove that the defendant had actual possession of a firearm or used it in any affirmative manner, but the evidence must show beyond a reasonable doubt that the firearm was available to provide protection to the defendant. Therefore, even if the defendant contends that he did no know that his co-conspirator possessed a pistol, for instance, the jury may convict him if his co-conspirator possessed the pistol.
The government is not required to prove that the defendant actually fired the weapon or brandished it at someone in order to prove use as that term is used in this instrument. However, you must be convinced beyond a reasonable doubt that the firearm played a role in or facilitated the commission of a drug trafficking offense. In other words, you must find that the firearm was a part of the drug offense charged.
The term firearm means any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosion. The term firearm also includes the frame or receiver of any such weapon or any firearm muffled or firearm silencer or destructive device. If a firearm plays a role in a drug trafficking crime, if it facilitates or has a potential to facilitate the crime in any way, it is being used or carried in relation to the drug trafficking crime. To facilitate means to make easier to commit. Moreover, the firearm's role can be a passive one such as being possessed for security or for possible contingencies, for example, embolding the committer of a drug trafficking crime by affording him the opportunity to display or discharge the weapon to protect himself or intimidate others whether or not such display or discharge actually took place. The fact that a firearm is unloaded or inoperable does not insulate the offender from the reach of this criminal statute.

16

relation to" language of the statute. That is, Broussard admitted possession but contested the fact that he used or carried the guns during and in relation to the drug offense.

When a district court refuses to include a requested instruction, the party requesting the instruction must show that the rejected instruction: "1) was substantially correct; 2) was not substantially covered in the charge delivered to the jury; and 3) concerned an important issue so that the failure to give it seriously impaired the defendant's ability to present a given defense." United States v. Duncan, 919 F.2d 981, 990 (5th Cir. 1990); United States v. Terrazas-Carrasco, 861 F.2d 93, 95 (5th Cir. 1988).

The language Broussard requested was substantially covered in the charge given.[7] Moreover, the instruction on § 924(c)(1) included this sentence: "However, you must be convinced beyond a

The display of a gun instills fear in the average citizen as a consequence and creates an immediate danger that a violent response will ensue.

[7]Broussard requested the following language:

Affirmative proof beyond a reasonable doubt of the relationship between the firearm and the drug trafficking offense is an essential element of the crime.

for example, the requirement that a firearms use or possession be "in relation to" the crime would preclude its application where its presence played no part in the crime, such as a gun carried in a person's pocket and never displayed and referred to in the course of the barroom fight.

There is not sufficient evidence to sustain a conviction if the government merely proves that a loaded gun was found in the same room as drug paraphernalia during the course of a search by the police.

17

reasonable doubt that the firearm played a role in or facilitated the commission of a drug trafficking crime." This passage belies Broussard's claim that he was precluded from arguing his defense to the jury. The district court's failure to include Broussard's language did not seriously impair his ability to present his defense.

Broussard also claims that the language he requested was necessary to clear up any confusion that may have resulted from the court's instruction on "possession" in the context of the possession with intent to distribute offense, which the court read just before the charge on § 924(c)(1). Broussard says the court's instruction may have lead the jury to believe that mere possession of a firearm was sufficient to convict under § 924(c)(1). We see no possibility for confusion. The court's explanation of possession came at the beginning of the instructions, before the § 924(c)(1) charge. It was also clear that § 924(c)(1) is a separate offense.

During oral argument, Broussard raised the fact that the district court omitted the word "integral" from the Fifth Circuit pattern jury instructions which provide that the jury "must find that the firearm was an <u>integral</u> part of the drug offense charged." See <u>Fifth Circuit Pattern Jury Instructions</u> § 2.45. The court's instruction was adequate. <u>See</u> <u>United States v. Caldwell</u>, No. 92-4813, slip op. at 2824 (Feb. 25, 1993) (noting that a firearm need not play an "integral role" to violate § 924(c)).

IV.

18

Finally, Broussard asserts error in his sentencing. He argues that the district court erred in denying him a reduction for acceptance of responsibility. Broussard offered to plead guilty to both counts if he could preserve his right to appeal the motion to suppress, but the government refused. The trial court refused to award acceptance of responsibility, apparently agreeing with the government's objection that Broussard had not accepted responsibility for the conduct alleged in Count 2, the § 924(c)(1) offense, citing United States v. Mourning, 914 F.2d 699, 705 (5th Cir. 1990).

U.S.S.G. § 3E1.1(b) provides that a defendant may receive the reduction whether he pleads guilty or goes to trial. Application Note 2 states "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." Note 2 also provides that conviction by trial does not automatically preclude the reduction. In rare circumstances, a defendant may accept responsibility even though he goes to trial. According to Note 2, these circumstances may exist where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt, such as a constitutional challenge to a statute or to the applicability of the statute to his conduct.

We agree with Broussard that as to the § 924(c)(1) offense, he accepted responsibility. He admitted ownership of the guns found in his home and their location. He went to trial to contend that

19

§ 924(c)(1) did not apply to these uncontested facts. This issue does not relate to factual guilt as that phrase in used in Application Note 2. See Isabel v. United States, 980 F.2d 60, 65 (1st Cir. 1992) (acknowledging that one of these "rare" circumstances may be present where defendant admits his conduct and denies only that it constitutes money laundering under the relevant statute); cf. United States v. Peery, 977 F.2d 1230, 1234 (8th Cir. 1992) (affirming denial of acceptance of responsibility deduction because trial focused on factual guilt as well as applicability of the statute).

Mourning does not support the court's denial of the reduction. There, the defendant was charged with numerous possession with intent to distribute offenses but pleaded guilty to money laundering. 914 F.2d at 702. He argued that the district court could not consider his conduct pertaining to the charged offenses in assessing his acceptance of responsibility. Rather, the court could only consider his conduct relevant to money laundering. We disagreed and held that a defendant must accept responsibility for all relevant conduct. Id. at 705. This situation is not presented here.

In its brief, the government offers an alternative ground on which to deny acceptance of responsibility, pointing to Item 11 in the presentence report which says that Broussard refused to identify his customers. See U.S. v. Fabregat, 902 F.2d 331, 334-35 (5th Cir. 1990) (lack of cooperation supports refusal to grant acceptance of responsibility). However, the district court made no

finding of lack of cooperation and therefore we express no view on this issue.  We leave it to the district court to determine anew whether Broussard has accepted responsibility, should that issue be reached.

REVERSED AND REMANDED.